DEARY v. HECLA CO.

1. MASTER AND SERVANT— CONTRIBUTORY NEGLIGENCE — DEFECTIVE APPLIANCES.

   An employé, injured because a bolt in a lever which he was operating had worked out for want of a cotter pin, was not guilty of contributory negligence *per se* for failing to discover the defect on the day after it arose.

2. SAME—ASSUMED RISK.

   A servant does not assume a risk of which he has no knowledge and the existence of which he has no grounds to suspect.

3. SAME—SAFE MACHINERY—DUTY TO MAINTAIN.
> The duty of furnishing safe machinery is not performed by providing the same in a safe condition in the first instance; the master is required to maintain appliances in a reasonably safe condition for the intended user.

4. SAME—FELLOW-SERVANT RULE.
> The breach of the duty to maintain appliances in a reasonably fit condition is not the neglect of a fellow-servant; it being the nondelegable duty of the master.

Error to Bay; Collins, J.  Submitted April 20, 1910. (Docket No. 121.)  Decided June 6, 1910.

Case by Samuel Deary against the Hecla Company for personal injuries.  A judgment for plaintiff is reviewed by defendant on writ of error.  Affirmed.

*Keena, Lightner & Oxtoby*, for appellant.

*De Vere Hall*, for appellee.

MOORE, J.  Plaintiff was injured while at work in the factory of defendant.  At the time of the accident he was a man about 38 years old.

Upon the trial, and in the argument before this court, excellent photographs and a model of the machine causing the injury were used.  This machine is called a " No. 2 ball machine."  It is very heavy.  It may be described in a general way as follows:  The machine is used to grind clinkers into cement, and the plaintiff was known as a " miller."  The machine is operated by electricity, securing its power from the power house.  By throwing on a switch the power is transmitted to the shaft.  Near the ball mill, at the other end of the shaft, there is a clutch device, by means of which the mill was connected with, and disconnected from, the power shafting.  For this purpose there is a metal strip or lever about 3½ feet long, 2 inches wide, and ½ inch thick between the clutch device and the ball mill, extending horizontally from the shaft. The operator starts the mill by throwing this lever to his

left, and he stops it by throwing it to his right. These movements of the lever shove forward or back a collar around the shaft, which causes the clutch device to engage with, or disengage from, the main shaft. The horizontal bar extends on the other side of the shaft a short distance, and is attached to a strip of metal which extends at right angles to the concrete foundation upon which the shaft rests near the ball mill. These two strips of metal are connected by a bolt, furnishing a fulcrum for the operation of the clutch device. Shortly before the accident happened, the foreman, after talking to plaintiff, decided that ball mill No. 2 should be stopped, and by his direction plaintiff, as was his duty, went to the lever by which the No. 2 ball mill was stopped, and pulled the lever. This was about a quarter after 3 o'clock in the morning. His account of what happened is as follows:

"When I got there, I walked up to the machine and I seen she was in running order, that is, the material was going through all right, and I went over and grabbed hold of the lever and went to jerk her out; of course, you have to pull very hard on these clutches, and I gave it a good jerk to pull it out, and there was no bolt on the other end at the time to hold it. By pulling the long end of the lever away from the pulley, it pulled the other or short end into the spokes of the clutch, either into the spokes of the clutch or the shoe that was fastened in the clutch. The pulley wheel was in motion, and the shoe was also in motion. When the shoe or spokes struck the short end of the lever, the long end of the lever was thrown sidewise suddenly, and it went up and hit me on the right side of my face, under my chin, and inside of the jawbone."

It was no part of the duty of the plaintiff to make repairs to the machinery. The foreman had the machine repaired in the afternoon before the injury. The testimony of the machinist who made the repairs was to the effect that, late in the afternoon before the plaintiff was injured, witness took apart this clutch apparatus on ball machine No. 2 for the purpose of placing a plank under the shaft on the cement pier; that to do this work he re-

moved a number of bolts, including the one in question, whereby the two strips of metal were connected, and that, after he had placed the plank under the shaft, he then replaced the bolts; that at the time he began this work this bolt was head downward with a cotter key above, as it had been since the plant was reconstructed in the spring; that he put the bolt back without a cotter key, and left it in that condition; that ordinarily he had only to go to the supply room adjoining, where he would find a supply of bolts and cotter keys which he might have used for this purpose.

A part of the testimony of this witness is as follows:

"I took off the shaft and cut some of the concrete off and put a board there. This was in order to raise the shaft up to keep it solid, I don't know who did the work with me. I did this towards night of the afternoon before plaintiff was hurt. When I went there, the machine was running, and I shut it down. * * * As far as I know, I did the repair all right. It was my duty to look over the whole of the machine, and I did it. It seemed to be all right, but the bolt didn't seem to be right. That is the bolt at the angle of the lever, being the one in question in this case. That bolt, when I left it at night, didn't have no cotter pin in it. It had two nuts on it, a jam nut. * * * In order to put the plank under that bearing, we had to take the cap off the bearing to the left of the cogwheel and then we had to take off the other bearing which is to the right of the cogwheel, and then we had to take the bolts off that fastened the iron strap onto the bearing, being the metal strap that regulates this clutch. We also had to take this bolt off at the angle of the lever and the strap (being the bolt in question in this suit), the one that must have dropped out. We took that bolt off. When we took that bolt off, it was a half-inch bolt, it was a good bolt. It was put in from below. * * * I took the bolt and laid it to one side, and, when I came to put it back together, I put the bolt back in the same place. There was no hole in the bolt for a cotter key, but there was in the first one there. I put the bolt up and the two burrs on. I brought the two burrs together, and I did it in a workmanlike manner with the burrs tight down onto the metal.

"*Q.* When did you ever hear of such a thing during your experience there on that large machine ?

"*A.* That two burrs got loose ?

"*Q.* In that place ?

"*A.* Every one of these bearings, the bolts, with the jam nuts on there, they work right off.

"*Q.* I asked you if this bolt ever dropped out of that place ?

"*A.* No, sir. The bolts with the jam nuts on there work right off. This bolt never dropped out of that place, and I never heard of it dropping out of a similar place on the other ball machine, but I know of them dropping out of a lot of other places. I saw that bolt previous to the accident every day. I didn't tell Mr. Redman about this bolt that I left in this place. That bolt was not taken out as I took it out on this occasion at any previous time that I know of. I never had any experience as a miller. I didn't think when I left the job that it was dangerous for anybody. It is usual to lock a bolt with a double nut. That is called a jam nut.

"*Q.* It seems to be your fault that this thing happened ?

"*A.* I don't know. It looks pretty bad, but I don't know how it is my fault.

"*Q.* What should you have done ?

"*A.* There ought to have been a cotter pin put in there.

"*Q.* Why didn't you put one in ?

"*A.* We didn't have none there.

"*Q.* You didn't have any cotter pins ?

"*A.* I didn't have no bolt with a hole in.

"*Q.* But the next morning when you got there you got a bolt with a hole in it ?

"*A.* I had to take some bolts and drill them.

"*Q.* The only reason that you did that the next day was that you wanted to put on these nuts, and you didn't do it because you didn't want to. Was there any other reason ?

"*A.* I guess the night before we didn't have time.

"*Q.* Did you think when you left the job that it was dangerous for anybody ?

"*A.* I didn't think it was.

"*Q.* You thought it was all right ?

"*A.* I thought maybe it would last. I had been accustomed to doing that in the sugar factory where I was employed. It is not a proper job in all places. It was not a proper thing to leave that nut in that case. I don't know

whether anybody else did that except me. I must be the cause of this thing. I don't know who else is to blame. * * * There was no hole in the bolt that I left in that place the night before plaintiff was injured, and I know there was no cotter pin through it. * * *"

Redirect examination by Mr. Hall:

"In putting these bolts in, Mr. Redman once told us to put them in with the heads on the bottom and the nuts up. I don't know why that was done. He knew that we did them in that way. It is the jar that makes the bolts work out. * * * In the matter of inspecting the machines to determine the condition of bolts and nuts, if plaintiff or the oiler happened to see anything loose, if there was anything of that kind, they ought to tell the man such and such a thing was loose. They were not required to go and look and find out and then report it. They had men there to look after it, and we called those men repair men. The only difference between repair men and millwrights is that a millwright will do more wood work than a repair man. I was a millwright. I put cotter keys in the next morning under Mr. Redman's instructions."

The circuit judge submitted the case to the jury, refusing to direct a verdict in favor of defendant, and also declining to give several requests desired by defendant. The jury returned a verdict in favor of plaintiff. The case is in this court upon writ of error. Counsel discuss the errors relied upon under the following heads:

(1) Plaintiff's injuries were not due to any act of defendant; but, on the contrary, to the act of a fellow-servant.

(2) Plaintiff assumed the risks connected with his employment.

(3) Plaintiff was guilty of contributory negligence.

(4) No negligent act of defendant was the proximate cause of plaintiff's injuries.

(5) The court erred in its charge as to defendant's duty in maintaining a safe place.

Each of these groups is argued at great length. We do not think it necessary to discuss groups 2 and 3 further than to say that we do not think it can be said, as a matter of law, that plaintiff was guilty of contributory negligence

in failing to discover the absence of the cotter pin so soon after the repair was made, nor that he assumed a risk of which he had no knowledge and the existence of which he had no reason to suspect.

Groups 1, 4 and 5 may be considered together. The court charged the jury:

"I charge you, as a matter of law, that it was the duty of defendant to construct and maintain the said friction clutch in a reasonably safe and fit condition for use, and if you find that in such construction and maintenance defendant should have inserted a key through such bolt and over such nuts, and that it was negligent in its failure to do so, and that while in the exercise of due care and without notice of such failure on the part of plaintiff he was injured in the manner claimed, then he is entitled to recover from defendant such damages as he has sustained through such negligent failure. * * * The duty of defendant to construct and maintain such clutch with reference to said bolt in a reasonably safe and fit condition for use called upon it to so construct the same in the first instance, and it is also called upon to maintain the same in a reasonably fit and safe condition for use after it was first so constructed. This last duty is what is known as a continuing one, and was not discharged as to plaintiff and others working thereabout as he was by a reasonably safe construction in the first instance. The defendant must continue to maintain the same in a reasonably safe and fit condition to answer the purposes for which it was designed at all reasonable times thereafter while it was in use."

Counsel insists this charge was wrong under the following authorities: *Atchison, etc., R. Co.* v. *Myers,* 63 Fed. 793, 11 C. C. A. 439, and *Louisville, etc., R. Co.* v. *Johnson,* 81 Fed. 679, 27 C. C. A. 367. The courts are not in harmony upon this question. It is not a new one, however, in this State. It was considered and passed upon in *McDonald* v. *Railroad Co.,* 132 Mich. 372 (93 N. W. 1041, 102 Am. St. Rep. 426). In the opinion in that case there is a very considerable collection of authorities, and it is not necessary to restate here what was said in that opinion. The charge of the court was in accord-

ance with what is there stated. The opinion also disposes of the fellow-servant question and of the proposition that no negligent act of defendant was the proximate cause of the accident adversely to the contention of defendant. See, also, *Geller* v. *Manufacturing Co.*, 136 Mich. 330 (99 N. W. 281).

The case was tried with great care. The questions of fact were submitted to the jury under careful instructions as to the law of the case.

Judgment is affirmed.

OSTRANDER, HOOKER, BLAIR, and STONE, JJ., concurred.